**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BOWANDA M.,

*Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_______________________________/

Case No. 2:26-cv-11038

Jonathan J.C. Grey
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 12)**

## I. RECOMMENDATION

For the reasons set forth below, it is **RECOMMENDED** that Plaintiff Bowanda M.'s motion for summary judgment be **GRANTED** (ECF No. 11),[1] Defendant the Commissioner of Social Security's motion for summary judgment be **DENIED** (ECF No. 12), and the final decision of the Administrative Law Judge (ALJ) be **VACATED**. If these recommendations are adopted, this case should be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this report and recommendation.

[1] Plaintiff's motion is incorrectly docketed as a memorandum rather than a motion for summary judgment.

## II. REPORT

### A. Introduction and Procedural History

On February 2, 2023, Plaintiff filed an application for disability insurance benefits; on August 18, 2023, Plaintiff filed an application for supplemental security income. (ECF No. 7-1, PageID.106). In both applications, she alleged disability beginning March 31, 2018. (*Id.*). The Commissioner initially denied the applications on February 13, 2024, and on reconsideration on July 3, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on June 9, 2025. (*Id.* at PageID.37–65, 106). The ALJ issued a written decision on June 26, 2025, finding that Plaintiff was not disabled. (*Id.* at PageID.103–21). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on January 27, 2026. (*Id.* at PageID.20–24).

Following the denial of review, Plaintiff sought judicial review on March 30, 2026. (ECF No. 1). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 11, 12, 13).

### B. Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 31, 2018. (ECF No. 7-1, PageID.108).

At step two, the ALJ found the following impairments severe: budging discs in back, collapsed valve in heart, arthritis, nerve damage, and gunshot wound with retained bullet in femur. (*Id.* at PageID.109). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.*).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently climb ramps and stairs, but never climb ladders, ropes and scaffolds. She can occasionally stooping [sic], but frequently kneel, crouch, and crawl. She must avoid any work allowing smoke. She must avoid all exposure to hazards (machinery, heights, etc.).

(*Id.* at PageID.110).

At step four, the ALJ found that Plaintiff had no past relevant work. (*Id.* at PageID.114). At step five, the ALJ found jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.115). Specifically, the ALJ found that Plaintiff could perform the requirements of a garment sorter (24,000 jobs in the national economy), a folder (31,000), and a marker (60,000). (*Id.*). The ALJ thus concluded that Plaintiff was "not disabled." (*Id.* at PageID.116).

**E. Administrative Record**

On appeal, Plaintiff raises two arguments. First, she argues that the RFC is

not supported by substantial evidence. Second, she argues that the ALJ erred when evaluating her treating cardiologist's opinion. While the Undersigned has reviewed the entire record, she will only summarize the evidence relevant to Plaintiff's arguments.

Plaintiff has a "history of mitral valve prolapse (diagnosed on echo 2021), mitral annulus disjunction, intermittent palpitations status post Medtronic loop recorder placement in 2022."[2] (ECF No. 7-1, PageID.723). She is treated by cardiologist Luis Afonso, MD FACC.

On December 21, 2022, Plaintiff presented to an appointment with Dr. Afonso, who noted that "[s]he ha[d] previously been on Metoprolol, changed to Bisoprolol and recently to nadolol 40 mg. She ran off [sic] her meds last Nov 2022. State[d] she accidentally was taking 80 mg daily [instead] of 40 mg and endorses to palpitations on exertion while she was on the 80 mg dose." (*Id.* at PageID.442, 445).

---

[2] "Mitral valve prolapse (MVP) is a common heart issue involving floppy valve leaflets that don't close tightly. It's harmless for most people. But it can become dangerous if it leads to severe mitral regurgitation (leaky valve). When blood leaks backward, your heart has to work harder. People with severe backflow may need valve repair or replacement." https://my.clevelandclinic.org/health/diseases/17241-mitral-valve-prolapse (last updated Aug. 6, 2026).

"An implantable loop recorder is a small device that a cardiologist implants in your chest during a minor, outpatient procedure. The device continuously monitors your heart rate and rhythm during your daily life and records anything abnormal. This helps diagnose arrhythmias that other tests, like an EKG or short-term monitor, couldn't detect." https://my.clevelandclinic.org/health/diagnostics/24543-loop-recorder (last updated Sep. 9, 2025).

Dr. Afonso also noted: “Exercise is limited [due] to palpitations and also limits her work ability.” (*Id.* at PageID.445). He “[r]efilled Nadolol 80 mg daily,” which Plaintiff said, “worked better tha[n] 40 mg and was well tolerated.” (*Id.* at PageID.446).

Plaintiff returned to Dr. Afonso on January 18, 2023, reporting that she had “one episode of palpitation along with diaphoresis, [shortness of breath] and dizziness without [chest pain] when she started light shoveling snow around 3 weeks ago. [She] had to rush inside the house, rest for 20–30 minutes until resolution of symptoms.” (*Id.* at PageID.436, 439). Following this episode, Plaintiff began “avoiding activities that may cause similar events.” (*Id.* at PageID.439). Her loop recorder “showed recurrent bigeminy and two episodes of tachycardia at 133 bpm. No V-tach or V.fib noted.” (*Id.* at PageID.440).

At her December 13, 2023 appointment, Plaintiff reported “feeling well overall” and occasionally experiencing palpitations but only when physically active. (*Id.* at PageID.632, 635). She “[d]enie[d] any other episodes of palpitations, headache, dizziness, syncope, chest pain, orthopnea, PND or lower extremity edema.” (*Id.* at PageID.635). Her loop recorder was functioning normally and recorded “[o]ne episode[] of atrial tachycardia,” which lasted less than a minute. (*Id.*). Plaintiff also “complain[ed] of hair thinning which she associate[d] with

Nadolol, and ha[d] decreased the dose from 80mg QD to 40mg QD." (*Id.*).

On July 18, 2024, Plaintiff "underwent [a] dobutamine stress test to evaluate for structural cardia[c] disease, and she developed mid-ventricular takotsubo cardiomyopathy during dobutamine stress test that did not resolve after an hour."[3] (*Id.* at PageID.723). As a precaution, Plaintiff was admitted to the emergency department "for overnight monitoring." (*Id.*). The next day, Plaintiff "was able to walk 40 feet without developing dyspnea, headaches, palpitations, dizziness," and was discharged home with directions to take aspirin and present to Dr. Afonso for further testing. (*Id.*).

Plaintiff returned to Dr. Afonso on July 24, for a transthoracic echo. (*Id.* at PageID.992). He reviewed the results, concluding: "Normal left ventricular size, wall thickness and systolic function. No regional wall motion abnormalities observed."[4] (*Id.*). Further, "[c]omplete recovery of [left ventricular] systolic dysfunction noted." (*Id.*). On August 1, Plaintiff underwent a cardiac computed tomography. (*Id.* at PageID.988). The conclusions of this test are as follows:

---

[3] "First described in 1990 in Japan, takotsubo cardiomyopathy is a weakening of the left ventricle, the heart's main pumping chamber. The condition is usually the result of severe emotional or physical stress, such as a sudden illness, the loss of a loved one, a serious accident, or a natural disaster such as an earthquake. That's why the condition is also called stress-induced cardiomyopathy or broken-heart syndrome." https://www.health.harvard.edu/heart-health/takotsubo-cardiomyopathy-broken-heart-syndrome (Apr. 6, 2026).

[4] These conclusions are consistent with those from Plaintiff's transthoracic echos in December 2021, July 2023, and June 2024. (ECF No. 7-1, PageID.585, 588, 994).

1. The coronary artery calcium Agatston score was 0. No significant coronary stenosis or anomalies noted. The findings of this study would be categorized as CAD-RADS 0.
2. The system is right coronary dominant. No obstructive CAD present.
3. Small PFO noted.
4. Moderately increased left and right atrial sizes.
5. The right ventricle is moderately dilated and evidence moderately dilated main pulmonary artery. Consider workup for pulmonary hypertension, clinical correlation suggested.
6. Normal ascending aortic and descending thoracic aortic dimensions.
7. Normal left ventricular size without LV hypertrophy.
8. Normal left ventricular systolic function. . . .

(*Id.* at PageID.990).

Further facts will be discussed as necessary below.

**F. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed

or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id.* § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation."

Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe

> impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind,

employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to

work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;

> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;
>
> (vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

> (4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G. Argument and Analysis

As stated above, Plaintiff raises two arguments on appeal. First, she argues that the RFC is not supported by substantial evidence. Next, Plaintiff argues that the ALJ erred in her evaluation of Dr. Afonso's opinion.

#### 1. Evaluation of Dr. Afonso's Opinion

The Undersigned begins with Plaintiff's argument that the ALJ erred when evaluating the opinion of her treating cardiologist, Dr. Afonso.

As a refresher, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain her approach with respect to supportability and consistency when considering a medical opinion. *Id.* § 404.1520c(b). For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."

*Id.* § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). Importantly,

> The new regulation substantially reduces the ALJ's obligation to explain the basis for his or her assessment of medical opinions:
>
> > [Source-level articulation.] Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *2 (6th Cir. Sept. 28, 2023) (quoting 20 C.F.R. § 404.1520c(b)(1)); *see also Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. 2022) ("Even for a medical opinion, there is no requirement to cite to every piece of evidence or conclusion.").

The ALJ evaluated Dr. Afonso's opinion in the portion of her decision explaining the RFC finding, writing:

> The undersigned has considered the opinion of Luis Afonso, M.D., one of the claimant's treating physicians who completed a medical source statement in April 2024. Dr. Afonso found that the claimant would miss about three days per month. Dr. Afonso found that the claimant could occasionally lift less than ten pounds. Dr. Afonso, found that the claimant needs the ability to shift positions at will from sitting, standing, or walking. Dr. Afonso found that the claimant could sit for about two hours in an eight-hour workday. Dr. Afonso found that the claimant could stand/walk for about four hours in an eight-hour workday. Dr. Afonso found that the claimant could only sit for ten minutes at a time. Dr. Afonso found that the claimant could only stand for ten minutes at a time. Dr. Afonso found that the claimant could only walk a quarter of a block without rest or severe pain. The undersigned finds that this opinion is unpersuasive because it is inconsistent with the general pattern of evidence contained in the hearing level record. The treatment record, which documents abnormal findings such as fatigue related to heart issues, mild medial tibiofemoral osteoarthritis, diffuse lumbar disc bulging, and degenerative changes in the left shoulder, is more consistent with limiting the claimant to light work. These conditions, taken together, reflect ongoing physical impairments that would reasonably restrict the claimant's ability to perform more demanding exertional activities. However, the abnormal findings on physical examinations must be considered with the numerous physical examinations showing normal medical findings. Moreover, this is a checklist form without support with explanation or treatment evidence from this doctor to support these significant limitations. In fact, there is little to no findings from Dr. Alfonso's [sic] treatment evidence in the record. In many examinations, both recent and closer to the alleged onset date, she had normal findings on physical examinations.

(ECF No. 7-1, PageID.113–14 (internal record citations omitted)). Elsewhere in the decision, the ALJ cited and discussed some of Plaintiff's cardiac testing. (*Id.* at PageID.112–13). However, the ALJ did not mention the notes from Plaintiff's

appointments with Dr. Afonso anywhere in the decision.

"The questions before this Court are whether the ALJ considered the full record in evaluating the persuasiveness of [this] opinion, appropriately articulated h[er] reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence." *Draine v. Comm'r of Soc. Sec.*, No. 1:22-CV-1370, 2024 WL 1014030, at *24 (N.D. Ohio Mar. 8, 2024). The Undersigned suggests that the answer to these questions is no.

As stated above, Plaintiff attended at least three office visits with Dr. Afonso during the relevant period. Her visits occurred on December 21, 2022 (ECF No. 7-1, PageID.442); January 18, 2023 (*id.* at PageID.436); and December 13, 2023 (*id.* at PageID.632). At these visits, Dr. Afonso reviewed Plaintiff's cardiac medication, recent cardiac episodes, and relevant loop recorder data. None of this was mentioned by the ALJ. But "ALJs are required by statute and regulation to consider a claimant's entire medical record before rendering a decision." *Mirian S. v. Comm'r of Soc. Sec.*, No. 4:23-CV-12979, 2024 WL 5439688, at *15 (E.D. Mich. Oct. 8, 2024), *report and recommendation adopted*, 2025 WL 645894 (E.D. Mich. Feb. 27, 2025).

The Commissioner is correct that Dr. Afonso's records include many test results that are essentially raw data. And an "ALJ may not interpret raw medical data in functional terms." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912

(N.D. Ohio 2008); *see also Flowers v. Comm'r of Soc. Sec.*, No. 14-CV-12449, 2015 WL 4274961, at *4 (E.D. Mich. July 14, 2015) ("[T]hat is, the MRI and the CT scan reports provide no insight into what additional limitations Plaintiff may suffer from based on the diagnoses therein."). However, this explanation fails to account for the parts of the records that are not raw data and are easily understandable to a lay person. For example, discussions about the efficacy of different medications and dosages, Plaintiff's self-reports of cardiac episodes and their causes, and the loop recorder data showing Plaintiff was experiencing cardiac symptoms including tachycardia. (*See, e.g.*, ECF No. 7-1, PageID. 439–40, 445–46, 635).

The lack of discussion of Plaintiff's self-reports is particularly concerning given that she consistently reported physical exertion as the cause of her cardiac symptoms. (*Id.* at PageID.439, 445, 635). While these self-reports were not required to be taken at face value, they are highly relevant to whether Plaintiff can perform the exertional requirements of light work and thus needed to be discussed. *See* Carolyn A, Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Court § 6:20 (2019) ("It should be fairly obvious that the ALJ must evaluate all of the evidence, and may not disregard any of the relevant evidence."). Notably, Plaintiff's self-reports are consistent with her adverse reaction during a July 2024 stress test. (ECF No. 7-1, PageID.723). Ultimately, "[r]egardless

of whether an ALJ's findings might happen to be supported by substantial evidence, [c]ourts must remand any decision where an ALJ refuses to consider, or simply overlooks, relevant evidence—so long as that unconsidered evidence could lead the ALJ to finding that the claimant is disabled." *Mirian S.*, 2024 WL 5439688, at *15.

Here, the ALJ either refused to consider or overlooked most of the records from Dr. Afonso. The ALJ incorrectly stated "there [are] little to no findings from Dr. Alfonso's [sic] treatment evidence in the record" and thus reasoned that Dr. Afonso's opinion was unsupported. (ECF No. 7-1, PageID.114). Given that there are many findings from Dr. Afonso's treatment evidence in the record, the ALJ's analysis of the supportability factor is legally unsound. Consideration of Plaintiff's *entire* medical record would necessarily change the supportability analysis. Moreover, *if* Dr. Afonso's opinion is considered more persuasive on remand, Plaintiff may be precluded from performing light work. And as Plaintiff correctly points out:

> The ALJ found that Plaintiff has no past relevant work and a limited education, and that she changed age category to "closely approaching advanced age." On these facts, a limitation to sedentary directs a finding of disabled under Rule 201.09. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.09."

(ECF No. 11, PageID.1308 (internal record citation omitted)). Therefore, because the unconsidered evidence could lead to a finding that Plaintiff is disabled, remand is appropriate.

**2. RFC Finding**

Even though adoption of the Undersigned's above recommendation would resolve this appeal, she will briefly address Plaintiff's argument that the RFC is not supported by substantial evidence. The Undersigned agrees.

"In making an RFC determination, an ALJ must evaluate the medical opinions in the record and determine their persuasiveness." *Culbertson v. Comm'r of Soc. Sec.*, No. 1:24-CV-01847, 2026 WL 696554, at *5 (N.D. Ohio Mar. 12, 2026). However, the relevant regulations imbue an ALJ "with discretion when formulating the RFC and [an ALJ] need not use the exact language of various medical opinions in the record when describing a claimant's abilities." *Stephen D. v. Comm'r of Soc. Sec.*, 734 F. Supp. 3d 729, 741 (S.D. Ohio 2024). Ultimately, if an "ALJ has undertaken a procedurally proper review of the medical records in formulating the RFC and the challenge is to the substance of the ALJ's formulation after that procedurally proper review, the bar for any such challenge is high, and it is the claimant's burden to meet it." *Id.*

Here, for the reasons explained in the preceding subsection, the Undersigned has found that the ALJ did *not* undertake a procedurally proper review of the medical records nor properly evaluate Dr. Afonso's opinion. Therefore, the ALJ's RFC

finding is not supported by substantial evidence and should be vacated.

### H. Conclusion

For these reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED** (ECF No. 11), the Commissioner's motion for summary judgment be **DENIED** (ECF No. 12), the ALJ's decision **VACATED**, and the case **REMANDED** for further proceedings.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 21, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge